UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------x

In re

SOUNDVIEW ELITE LTD., *et al*., Chapter 11

                       Post-Confirmation Debtors.

Case No. 13-13098 (MKV)
(Post Confirmation)

----------------------------------------------------------------------------x

In re

RICHCOURT EURO STRATEGIES INC., *et al*., Chapter 15

                Debtors in Foreign Proceedings.

Case No. 15-12273 (MKV)
(Jointly Administered)

----------------------------------------------------------------------------x

CORINNE BALL, as Plan Administrator of
SOUNDVIEW ELITE LTD., *et al.* and IAN MORTON and
MARTIN TROTT, as Joint Liquidators of RICHCOURT
EURO STRATEGIES INC., *et al.*,

Adv. Pro. No. 15-01346
(MKV) (Consolidated)

                Plaintiffs.

                v.

SOUNDVIEW CAPITAL MANAGEMENT LTD., *et al.*,

                Defendants.

----------------------------------------------------------------------------x


### DECISION GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST ALPHONSE "BUDDY" FLETCHER


APPEARANCES:


ARCHER & GREINER, PC
*Counsel for Plaintiff Corinne Ball, as Chapter 11*
*Trustee of Debtor Soundview Elite Ltd.*
630 Third Avenue, Seventh Floor
New York, NY 10017
By:    Gerard DiConza, Esq.

1

ALPHONSE FLETCHER, JR.
*Pro Se Defendant*
188 Minna St., Apt. 34C
San Francisco, CA 94105

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**:

The Chapter 11 Trustee has moved for Summary Judgment on some, but not all, of its claims against Defendant Alphonse "Buddy" Fletcher [ECF No. 207].  In support of her Summary Judgment Motion, the Trustee filed a memorandum of law [ECF No. 210] and the declarations of Geoffrey Varga (the "Varga Dec'l.") [ECF No. 208] and Gerard DiConza (the "DiConza Dec'l.") [ECF No. 211].  In accordance with Local Bankruptcy Rule 7056-1(b), the Trustee's motion is supported by a statement of undisputed material facts, dated July 8, 2016 ("Trustee's Stmt. of Facts") [ECF No. 209].  Fletcher has not filed an opposition to the motion. The Trustee filed a reply memorandum of law in further support of the Summary Judgment Motion (the "Reply Brief") [ECF No. 213] to address the applicable legal standard in light of the absence of any opposition to the Motion.  On September 20, 2018, the Court heard argument on the Summary Judgment Motion (the "Summary Judgment Hearing").  Fletcher did not appear at the Summary Judgment Hearing.

The Trustee seeks judgment as a matter of law on three claims for breach of fiduciary duty and two claims for fraudulent transfer, as well as summary judgment dismissing all of Fletcher's counterclaims.  For the reasons stated below, the Trustee is entitled to judgment on her fiduciary breach and fraudulent transfer claims, as well as against Fletcher's counterclaims.

2

# BACKGROUND

## Procedural Background

Soundview Elite and its affiliated entities (collectively, the "Soundview Funds"), open-ended investment companies registered in the Cayman Islands, filed for chapter 11 bankruptcy on September 24, 2013.  In early 2014, this Court approved the appointment of Corinne Ball to serve as Chapter 11 Trustee for the jointly administered cases [Case No. 13-13098 ("Main Case"), ECF No. 160].  Later that year, a number of related investment funds incorporated in the British Virgin Islands (the "BVI Funds") were placed into liquidation and assigned joint liquidators, who filed cases in this Court under chapter 15 of the Bankruptcy Code [Case No. 15-12273].  Pursuant to a Cross-Border Insolvency Protocol [Main Case, ECF No. 502], Ms. Ball is authorized to prosecute claims on behalf of both the Soundview Funds and the BVI Funds (together, the "Richcourt Funds" or the "Funds").

On September 23, 2015, the Trustee filed her Complaint [ECF No. 1] commencing this Adversary Proceeding against several insiders of the Funds, including Alphonse Fletcher, Jr. Thereafter, the Trustee filed an Amended Complaint [ECF. No. 52].  The Amended Complaint asserted twenty-one causes of action, including claims for breaches of fiduciary duty, turnover, fraudulent transfers and disallowance of claims.

The Trustee now moves, pursuant to Federal Rules of Bankruptcy Procedure Rule 7056 and Federal Rules of Civil Procedure Rule 56, for summary judgment on five of those causes of action against Defendant Fletcher, three based on breaches of fiduciary duty (counts nos. 3, 5 and 8) and two for fraudulent transfers (counts nos. 15 and 18).  *See* Amended Complaint ¶ ¶ 326-358; 374-405; 421-438; 498-507; 522-530.

3

The breach of fiduciary duty claims are based on Fletcher's failure to timely and properly disclose to investors of the Funds his acquisition of the Richcourt Funds (count no. 3), on three instances of defalcation by Fletcher following his acquisition of the Richcourt Funds (count no. 5), and based on the so-called "New Year's Eve Transaction" and Related Agreements (count no. 8).  The two fraudulent transfer claims each seek to avoid the same two transfers made to Fletcher, based on alternative theories, either under Section 548(a)(1)(B) of the Bankruptcy Code, which is applicable to transfers made at a time when a debtor is insolvent and within two years of bankruptcy filing (count no. 18), or alternatively pursuant to Section 544 of the Bankruptcy Code, which allows the Trustee to bring fraudulent transfer claims on behalf of the estate under state law, here pursuant to Sections 273, 274, 275, 278, and 279 of the New York Debtor and Creditor Law (count no. 15).

**Factual Background**

The relevant facts, as set forth in the Statement of Undisputed Facts are not disputed and therefore deemed true, to the extent that they are supported by competent evidence.  *See* Fed. R. Civ. P. 56(e).

<u>The Richcourt Acquisition</u>

Prior to their bankruptcy, the Richcourt Funds carried on business as open-ended investment companies with each fund registered as a mutual fund in the Cayman Islands or British Virgin Islands.  *See* DeConza Dec'l at Exh. 9 (Soundview July 2009 Investment Brochure).  At their peak in June 2008, the Richcourt Funds had approximately $1.55 billion under management.  DeConza Dec'l, Exh. 13 at 14:13-16; 15:14-23 (Fletcher Deposition from November 5, 2013).  At that time, the Citco Group and its affiliates ("Citco") owned, managed

4

and controlled the Richcourt Funds through Richcourt Holding Inc. ("RHI"). *See* DeConza Dec'l, Exh. 6 at ¶ 96 (Direct Testimony/Affidavit of Fletcher on Motions to Dismiss, Convert, or Appoint a Trustee).[1]

In June 2008, persons affiliated with Citco asked Alphonse Fletcher, Jr. if he would be interested in bidding for the purchase of the management shares in the Richcourt Funds. DeConza Dec'l, Exh. 6 at ¶ 96 (Fletcher's Direct Testimony/Affidavit). At the time, Fletcher, through his wholly-owned Fletcher Asset Management Inc. ("FAM"), managed a number of other investment funds, including: (a) Fletcher Income Arbitrage Fund, Ltd. ("Arbitrage"); (b) FIA Leveraged Fund Ltd. ("Leveraged"); (c) Fletcher Fixed Income Alpha Fund, Ltd. ("Alpha"); (d) Fletcher International Inc. ("FII"); and (e) Fletcher International, Ltd. (Bermuda) ("FILB") (collectively, the "Fletcher Funds"). Stmt. of Facts at ¶ 5-6; Deconza Dec'l, Exh. 5 at 13-14 (FILB Trustee's Report and Disclosure Statement).

Fletcher was interested in the offer for several reasons, including the potential to earn significant management fees of at least $5 million per year over the next five years. Deconza Dec'l, Exh. 6 at ¶ 96). On June 20, 2008, Citco sold 85% of RHI to Fletcher,[2] (*see* DeConza Dec'l at Exh. 10) (Share Purchase Agreement), giving Fletcher ownership of 85% of the management shares in the Richcourt Funds (the "Richcourt Acquisition"). Fletcher was

---

[1] RHI was the parent company of Soundview Capital Management ("SCM") and Richcourt Capital Management ("RCM") (Stmt. of Facts at ¶ 15), which, in turn, owned the voting shares and acted as investment managers to each of the Richcourt Funds pursuant to investment management agreements ("IMAs"). *See* DeConza Dec'l at Exh. 7 (Investment Management Agreement). Pursuant to the IMAs, SCM and RCM undertook to manage and monitor the Richcourt Funds. *Id*. at 3-4.

[2] Fletcher created a holding company, Richcourt Acquisition Inc. ("RAI"), to facilitate the transaction. *See* DeConza Dec'l, Exh. 6 at ¶ 97.

appointed director and chairman of RHI.  *See* DeConza Dec'l at Exh. 8 (Fletcher's Consent to Act as Director); DeConza Dec'l, Exh. 9 at 22 (Soundview July 2009 Investment Brochure).

Fletcher quickly installed a team of directors who were aligned with him. As of July 2009, RHI's directors were Fletcher, Ermanno Unternaehrer, Denis Kiely, Stewart Turner and Fletcher's brother, Todd Fletcher.  Kiely and Turner previously had been employees of FAM. *See* DeConza Dec'l at Exh. 12 (Resolutions of Board of Directors).  Kiely has described himself as Mr. Fletcher's "right-hand man."  *See* DeConza Dec'l, Exh. 5 at 44 (citing Kiely SEC Dep. 409:6-7, Apr. 17, 2012).

Fletcher was personally responsible for managing the business affairs of the Richcourt Funds, including supervising the activities of the administrators and subadministrators and maintaining corporate records (s*ee* DeConza Dec'l, Exh. 11 at 19 (Declaration of Fletcher Pursuant to Local Rule 1007-2)), and was also a member of the Richcourt Funds' investment management team.  *See* DeConza Dec'l, Exh. 22, Ladner Tr. at 132:22-133:8 (Ladner Deposition).  On September 4, 2012, Fletcher was appointed director of each of the individual Richcourt Funds.  *See* DeConza Dec'l at Exh. 4 (Fletcher's Proof of Claim Against the Soundview Funds' Estates).

<u>Failure to Disclose the Richcourt Acquisition</u>

Although Fletcher acquired the management shares of the Richcourt Funds from Citco in June 2008, he did not notify the Richcourt Fund investors for a number of months.  *See* DeConza Dec'l, Exh. 13, Fletcher Tr. at 36:4-13 (Fletcher Deposition).

Soon after the Richcourt Acquisition, Lehman Brothers collapsed, and in September 2008 RHI's access to credit expired.  Stmt. of Facts at ¶ 35-36; DeConza Dec'l, Exh. 5 at 77.  In

6

November 2008, Fletcher began investing assets of the Richcourt Funds into Arbitrage, one of the Fletcher Funds. Stmt. of Facts at ¶ 38; DeConza Dec'l, Exh. 5 at 223. Between November 2008 and March 2010, Fletcher removed $61.7 million of cash from the Richcourt Funds and invested it into various Fletcher funds. Stmt. of Facts at ¶ 39; DeConza Dec'l, Exh. 5 at 223.

In a letter to investors dated December 30, 2008, the Richcourt Acquisition was described as an equity investment by FAM instead of a change in control. DeConza Dec'l at Exh. 15 (December 2008 Letter). The letter notified investors that they would be barred from cashing out their investments because the Board of Directors had decided, in light of the recent financial crisis, that they would not honor requests to redeem investments that were dated less than one month earlier. *Id.*

In January 2009, the directors of the Richcourt Funds again wrote to investors to inform them that redemptions might soon resume. *See* DeConza Dec'l at Exh. 16 (January 2009 Letter). The January 2009 letter contained a "Q and A" section that discussed the Richcourt Acquisition. *Id.* This section contained false information regarding the management of the Funds. For example, it read:

> Q: Has management of the Richcourt Group changed?
>
> A: No, all executives of the Richcourt Group have been retained, certain former Richcourt Group executives have rejoined the firm, and Citco executive Ermanno Untemaehrer continues on Richcourt's board.

*Id.* at 4. Contrary to these claims, the management structure of the Richcourt Funds had changed significantly following the Richcourt Acquisition. Kiely and Turner had become directors of the Funds, and ultimate decision-making authority had been transferred to Fletcher by way of his position as Director and Chairman of RHI. *See* DeConza Dec'l at Exhs. 8 and 9.

7

The December 2008 and January 2009 Letters also misrepresented the expiration of the

Funds' lines of credit.  In explaining the decision to suspend redemption requests, the December

2008 Letters referred only to the "expiration of *a* credit facility" (DeConza Dec'l at Exh. 15) and

the January 2009 Letters mentioned "*uncertainty* regarding the fund credit line (DeConza Dec'l

at Exh. 16).  This language belied the undeniable fact that the Funds' lines of credit had expired

months earlier and was not renewed.  Stmt. of Facts at ¶ 35-36; DeConza Dec'l, Exh. 5 at 77.

<u>New Year's Eve Transaction</u>

Three of the Fletcher Funds, Arbitrage, Alpha and Leveraged, were placed into

liquidation proceedings in 2012 in the Cayman Islands.  Stmt. of Facts at ¶ 58; DeConza Dec'l,

Exh. 5 at 107-08.  In June 2012, another Fletcher Fund, FILB, filed for chapter 11 bankruptcy in

this Court.  Stmt. of Facts at ¶ 62; DeConza Dec'l, Exh. 5 at 108, *see* Case No. 12-12796 (MKV)

(June 29, 2012).  The Court appointed a Chapter 11 Trustee in the FILB case, who demanded

that Fletcher unwind an April 22, 2012 transfer of $2.2 million in cash from FILB to FII, a non-

debtor Fletcher Fund.  Stmt. of Facts at ¶ 64; DeConza Dec'l, Exh. 5 at 122-23.

On December 31, 2012, while negotiations were ongoing between Fletcher and the FILB

Trustee, Fletcher executed documents that in effect transferred $4 million from Soundview Elite

to FII in exchange for an equity interest in FILB (which, as noted, had filed for chapter 11).  *See*

DeConza Dec'l at Exh. 18 (December 31 Sales Agreement); Exh. 23 Saunders Tr. 36:3-22; 74:6-

75:12; 83:22-84:6 (Floyd Saunders Deposition).  At that time, Fletcher was a board member of

both FII and Soundview Elite, as well as SCM and FAM, the investment advisors and managers

of Soundview Elite and FII, respectively.  *See* DeConza Dec'l, Exh. 23, Saunders Tr. at 83:25–

84:18; 84:19- 85:4.  Fletcher signed the sales agreement for both sides of the transaction, as

director of both FII and Soundview Elite.  DeConza Dec'l at Exh. 18.  Gerti Muho, a co-

defendant in this adversary proceeding, also signed the sales agreement as the second director of Soundview Elite. *Id.*

RF Services, a Fletcher affiliate, determined the price that Soundview Elite would pay for the equity stake in FILB, a bankrupt investment vehicle. *See* DeConza Dec'l. Exh. 13, Fletcher Tr. at 75:14-75:17; 85:5-85:8. Fletcher did not seek an independent appraisal. *Id.* Fletcher and RF Services had had conversations with the FILB Trustee, who had given no indication that FILB's equity holders would receive any distribution in the bankruptcy. *Id.* at 76:19-77:3; 76:14-18. Despite this and in the face of outstanding unpaid redemption requests from Soundview's investors (*see id.* at 77:4-11), Fletcher caused Soundview Elite to pay $4 million to FII for an equity stake in FILB. DeConza Dec'l. Exh. 19 at 4 (FILB Administrative Expense Claim).

FII used the money transferred from Soundview Elite to repay the FILB Trustee the $2.2 million and also to pay legal fees, including Fletcher's personal legal fees. *See* DeConza Dec'l, Exh. 13, Fletcher Tr. at 80:4-82:21. FII additionally used a portion of the $4 million to pay directors fees to Fletcher and other members of his team. *See id.* at 82:23-83:8.

Bankruptcy

On September 24, 2013, each of the Soundview Funds commenced a voluntary chapter 11 in this Court. Fletcher filed a proof of claim in the bankruptcy for payment of post-petition director's fees in the amount of $10,070.65, which the Trustee later moved to subordinate. *See* Main Case, ECF No. 1033. On May 20, 2016, this Court entered an order [Main Case, ECF No. 1099] granting the Trustee's motion to subordinate Fletcher's claim and other insider claims.

The Trustee brought twenty-eight adversary proceedings in the bankruptcy, many of which were consensually resolved, with settlements approved by the Court pursuant to Bankruptcy Rule 9019.  In this adversary proceeding, the Citco defendants and certain related individual defendants (the "Citco Defendants") moved to dismiss the Complaint for lack of personal jurisdiction and failure to state a claim [ECF Nos. 57-59, 61].  After extensive briefing and several days of oral argument, the Trustee settled with all Citco Defendants while the motions to dismiss were pending.  The Court approved the settlements [ECF No. 161] and dismissed all claims against the Citco Defendants [ECF No. 164].

On August 31, 2017, this Court confirmed the Chapter 11 Trustee's plan ("the Plan") [ECF No. 1509].  The Plan provided for Fletcher's claim as follows: "Class 5 (Insider Claims) . . . will not receive or retain any property on account of their Claims or Interests and such Holders are deemed to have rejected the Plan pursuant to section 1126(g)."  Plan at § 5.2(e).

## DISCUSSION

## I. <u>Jurisdiction</u>

As an initial matter, in his Answer to the Trustee's Complaint in this case (the "Answer") [ECF No. 18], Fletcher expressly denies all allegation in the Complaint (other than two specific allegations) and denies all conclusions, including the Trustee's assertion that this Court has jurisdiction over this matter and her consent to entry of final judgment by this Court.  *See* Complaint [ECF No. 1] at ¶ 91.  He also demands a jury trial.  Answer at 8.  Against this backdrop and under governing law, and notwithstanding Fletcher's default on this Motion and

10

his proof of claim filed against the Debtor, the Court rejects the Trustee's contention that

Fletcher has implicitly consented to this Court's authority to enter final judgment in this case.[3]

In *Stern v. Marshall*, the Supreme Court held that Bankruptcy Courts lack the

constitutional authority to enter final judgments in adversarial proceedings, even in "core"

proceedings under § 157(b)(2)(C), if those claims implicate private, state-law rights.  564 U.S.

462 (2011).  *See In re Ne. Indus. Dev. Corp.*, 511 B.R. 51, 53 (S.D.N.Y. 2014); *In re Lyondell*

*Chemical Co.,* 467 B.R. 712, 719 (S.D.N.Y. 2012) ("Under Stern, it is not the core/non-core

distinction but Article III that determines the bankruptcy court's adjudicative authority."); *Dev.*

*Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 464 (S.D.N.Y. 2011).

*Stern* identified three circumstances where a bankruptcy court undoubtedly does have the

constitutional authority to enter final judgments in an adversary proceeding: (1) the claim at issue

falls within the public rights exception (*Stern*, 564 U.S. at 504); (2) the state law claim would

necessarily be resolved in ruling on a creditor's proof of claim (*id.* at 499); or (3) the parties

unanimously consent to final adjudication by a non-Article III tribunal.  *Id.* at 481-82.  *See also*

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 191 L. Ed. 2d 911 (2015).

Although the facts of *Stern* involved a counterclaim asserted by the bankruptcy debtor,

the same jurisdictional framework applies to affirmative claims initiated by the debtor or trustee.

---

[3] While issues of jurisdiction and issues of final adjudicative power are "distinct," see *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 471 (S.D.N.Y. 2011), it is facially implausible that a party would implicitly consent to final judgment by a bankruptcy court while at the same time objecting to the threshold issue of whether the same court has personal jurisdiction over the party, especially in light of the Supreme Court's explicit instructions that a party's consent to final jurisdiction must be "knowing and voluntary."  *Wellness International Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1937, 191 L. Ed. 2d 911 (2015).  In *Wellness*, the Supreme Court indicated that the "key inquiry [to consent] is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try to the case before the non-Article III adjudicator."  *Id.* at 1948. Based on Fletcher's blanket denial of the Trustee's allegations and his objection to personal jurisdiction, it would be incongruous to conclude that he nonetheless "voluntarily" consented to having the Trustee's claims tried in bankruptcy court.

*See Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, 2172, 189 L. Ed. 2d 83

(2014) (acknowledging that "neither party contests th[e] conclusion" that the fraudulent

conveyance claims in the case were *Stern* claims, in that they are "core" under § 157(b), but

nonetheless implicate private rights); *see also In re Lyondell Chem. Co.,* 467 B.R. 712, 720

(S.D.N.Y. 2012); *In re Lehman Bros. Holdings Inc*., 480 B.R. 179, 190 (S.D.N.Y. 2012);

*Adelphia Recovery Tr. v. FLP Grp., Inc.* 2012 WL 264180, at *4 (S.D.N.Y. Jan. 30, 2012); *Dev.*

*Specialists,* 462 B.R. at 469.

 It has not been argued that the Trustee's claims in this case fall within the public rights

exception[4] and the Court concludes that the claims do not satisfy either of the other two *Stern*

exceptions.  The claims asserted, for fiduciary breach and fraudulent transfer, are clearly *Stern*

claims, at the same time "relating to" the bankruptcy but also implicating private rights.  *See In*

*re Oldco M Corp*, 484 B.R. 598, 607 n.5 (noting the distinction between Trustee's fraudulent

conveyance actions, like the causes of action asserted here, which are "quintessentially common-

law suits that more nearly resemble state-law contract claims by a bankrupt corporation to

augment the bankruptcy estate" and preferential transfer actions, which involve the public rights

of "creditors' claims to a pro rata share of the bankruptcy *res*.").  As such, absent consent by

Fletcher, the Court lacks jurisdiction to enter a final judgment on the Trustee's claims, unless the

claims would be necessarily resolved in ruling on Fletcher's proof of claim.  *Stern*, 564 U.S. at

499.

---

[4] Public rights claims are "derived from" or "closely intertwined" with a federal regulatory scheme and can therefore be fully adjudicated by an Article I bankruptcy court without intruding on the separation of powers set out by Article III. *See Kirschner v. Agoglia*, 476 B.R. 75, 80 (S.D.N.Y. 2012) (citing *Stern*, 564 U.S. at 487-496.  This is in contrast to "private rights" claims, which are "the 'stuff' of common law, over which only an Article III court can render final judgment." *Id.*

12

The Trustee argues that this Court has jurisdiction to enter final judgments on her claims, either because Fletcher implicitly consented to final judgment by failing to file a response to the Motion for Summary Judgment or, alternatively, because the Trustee's claims necessarily would be resolved in the process of allowing or disallowing Fletcher's proof of claim. The Trustee is incorrect.

A. <u>Implied Consent by Failing to Respond to Motion for Summary Judgment</u>

The Trustee argues that Fletcher impliedly consented to entry of a final judgment by this Court by failing to object to the Trustee's Motion for Summary Judgment. The Court disagrees.

The Trustee relies on *In re Oldco M Corp* for the proposition that "*Stern* does not limit the bankruptcy court's authority to enter a default judgment when the defendant has failed to respond to the summons and complaint." 484 B.R. at 601. This argument conflates the legal effects of failing to respond to a complaint and failing to respond to a motion for summary judgment.

In *Oldco*, the defendants, despite having received notice on four separate occasions, failed altogether to respond to the Trustee's summons and complaint. *Id.* This is markedly different from the procedural history here. In this adversary proceeding, Fletcher did not default, but rather responded to the Complaint with an Answer,[5] denying almost all factual allegations and disputing this Court's jurisdiction over him, and thereafter failed to respond to the Motion for Summary Judgment. The Committee Notes for Rule 56 of the Federal Rules of Civil

---

[5] Although Fletcher did not file a subsequent Answer in response to the Amended Complaint, the Amended Complaint did not assert any additional claims against him, and further, the Trustee did not proceed against Fletcher in this action under any theories based on default. *See* Transcript from Hearing on Motion for Summary Judgment (the "Hearing Transcript") [ECF No. 215] at 5:1-5 ("[This is not] a simple default situation . . . where a party fails to respond to a run-of-the-mill type motion. It is a summary judgment, and we do have to make our case based on the undisputed facts.").

Procedure clearly state that "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion."

Not only did Fletcher respond to the initial complaint with his Answer, he explicitly contested the Bankruptcy Court's jurisdiction over him.  Answer at Seventh Defense ¶ 13 ("The Bankruptcy Court does not have jurisdiction over Defendant Fletcher in this matter."). Moreover, in his Answer, Fletcher explicitly demanded a jury trial under Federal Rules of Civil Procedure Rule 38(a).  *See Dev. Specialists*, 462 B.R. at 469-70 ("[W]here a jury right is asserted, any consent to final adjudication in Bankruptcy Court must be express.") (cited by *In re Oldco*, 484 at 607); *see also* 28 U.S.C. § 157(e) ("If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial . . . with the express consent of all the parties.").

As the Supreme Court held in *Wellness International,* a litigant's consent to the bankruptcy court's jurisdiction to finally adjudicate claims "—whether express or implied—must be knowing and voluntary."  135 S. Ct. at 1937.  The court in *Oldco*, the sole case relied on by the Trustee to support the adjudicative authority of this Court, cautioned that "implied consent should not be lightly inferred; indeed, 'a waiver of important rights should only be found where it is fully knowing.'"  484 B.R. at 609 (quoting *Messer v. Bentley Manhattan Inc.* (*In re Madison Bentley Assocs., LLC*), 474 B.R. 430, 437 (S.D.N.Y.2012). *In re Lyondell*, 467 B.R. at 722 (defendants' active participation in bankruptcy proceedings without objection for over a year, including the bankruptcy court's order confirming the plan and allowing the court to "hear and determine" claims, did not amount to the defendants' implied consent to the court's ability to enter final judgment on the plaintiff's fraudulent transfer claims).  On the facts and procedural history before it, this Court cannot infer Fletcher's consent to entry of a final judgment.

14

B.  Filing of a Proof of Claim

A bankruptcy court does, of course, have jurisdiction to issue final judgments on claims

that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance

process." *Stern,* 564 U.S. at 499.  *See Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S. Ct. 330,

331, 112 L. Ed. 2d 343 (1990) ("[B]y filing a claim against a bankruptcy estate the creditor

triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the

bankruptcy court's equitable power."); *In re Arbco Capital Mgmt., LLP*, 479 B.R. 254, 262–63

(S.D.N.Y. 2012) ("A creditor may subject itself to the binding authority of the bankruptcy

court by filing a proof of claim against the bankrupt estate.").

Clearly, though, not all core proceedings under Section 157(b) revolve around the

allowance or disallowance of a claim against the estate.  Some actions are "brought solely to

augment the bankruptcy estate."  *In re Lyondell*, 467 B.R. at 720.  *Stern* turned on precisely that

issue.  "Counterclaims by the estate against persons filing claims against the estate" are core

proceedings under Section 157(b)(2)(C).  Despite this, a bankruptcy court does not have final

adjudicative authority over every possible claim between the debtor and a creditor.  Because a

creditor must file a proof of claim to recover against the estate, the act of filing a proof alone

"cannot be considered consent to bankruptcy court's decision of matters unrelated to that claim

or the bankruptcy."  *In re Oldco*, 484 B.R. at 607.

The question under *Stern*, then, is whether each factual and legal element of the claims

asserted by the Trustee "would necessarily be resolved in the claims allowance process" in

connection with Fletcher's proof of claim.  *Stern*, 564 U.S. at 487.  For the reasons discussed

below, the Court answers this question in the negative and concludes that it does not have

authority to issue a final judgment on the claims against Fletcher in this adversary proceeding.

15

This decision should therefore serve as proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1). *See Exec. Benefits,* 134 S. Ct. at 2172 (2014).

<u>Fletcher's Claim Against the Estate</u>

Fletcher submitted a proof of claim in the Soundview bankruptcy, 13-13098, for an administrative claim in the amount of $10,070.65 (Claim No. 8-1). DeConza Dec'l at Exh. 14. The basis for the claim is listed as a "claim arising from post-petition directors' fees." *Id.* Prior to filing the claim and before Plaintiff was installed as Chapter 11 Trustee, Fletcher and other insiders, as managers of the debtor-in-possession, moved the Court for authority to pay Fletcher's and other insiders' directors fees as post-petition administrative expenses [Main Case, ECF No. 192]. At a hearing dated March 19, 2014, the Court denied the applications without prejudice [Main Case, ECF No. 242 at 31:7-12]. Fletcher subsequently filed proof of claim 8-1.

Later in the bankruptcy, after the Trustee began investigating the mismanagement of the Debtor by the Insiders and after this adversary proceeding was initiated, the Trustee filed a Notice of Objection to Insider Claims and Subordination of Such Claims [Main Case, ECF No. 851]. Fletcher and others failed to oppose the Notice, and the Trustee then moved to subordinate the Insider Claims [Main Case, ECF No. 1033]. This Court entered an order subordinating the Insider Claims, including the claim filed by Fletcher seeking director's fees [Main Case, ECF No. 1099]. On August 31, 2017, the Debtor's Plan of Reorganization [Main Case, ECF No. 1509] was confirmed pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, and provided for Fletcher's claim as follows: "Class 5 (Insider Claims) . . . will not receive or retain any property on account of their Claims or Interests and such Holders are deemed to have rejected the Plan pursuant to section 1126(g)." *See* Plan at § 5.2(e).

16

Fletcher's claim has effectively been disallowed.  Thus, the Trustee's claims in this adversary proceeding were not necessarily resolved in the claims allowance process with regards to Fletcher's claim, and his filing of the claim does not constitute consent to the Court's authority to fully adjudicate the Trustee's adversary proceeding.

<u>The Trustee's Claims in this Adversary Proceeding</u>

Under Bankruptcy Rule 3006(b), a party can include an objection to a proof of claim in an adversary proceeding.  Nonetheless, an objection to a claim against the Debtor's estate and an adversary proceeding are procedurally different.  *See Cruisephone, Inc. v. Cruise Ships Catering and Servs. N.V. (In re Cruisephone, Inc.),* 278 B.R. 325, 330 (Bankr. E.D.N.Y. 2002) ("A proof of claim filed by a creditor is conceptually analogous to a civil complaint, an objection to the claim is akin to an answer or defense and an adversary proceeding initiated against the creditor that filed the proof of clam is like a counterclaim.").

The Trustee's claims in this adversary proceeding do not reference Fletcher's proof of claim or claims against the estate at all.  The causes of action are not framed as defenses to Fletcher's proof of claim, but rather as affirmative actions seeking to increase the *res* of the estate.  Of course, "*Stern* does not require courts to ignore a debtor's defenses to a proof of claim."  *In re Penson Worldwide,* 587 B.R. 6, 18 (Bankr. D. Del. 2018).  But even if the claims asserted in the Amended Complaint could reasonably be read as an objection to Fletcher's (or any other insider's) claims against the estate, these defenses must actually be plead.  *Cf. id* (bankruptcy court could enter final judgment where "the basis of Plaintiff's defense to the proof of claim and its affirmative claims is the same . . . [and] each count has the same factual predicate").

17

Moreover, the Trustee filed a specific Objection to Fletcher's and other Insiders' proofs of claims, which ultimately succeeded in subordinating the claims without the need for a hearing or any fact-finding by the Court because no opposition to the motion was filed. *See* Notice of Objection ("If no opposition against the subordination of these Insider Claims is filed with this Court . . . all the insider Claims listed on Exhibit A shall be subordinated as set forth in the Addendum."). Pursuant to the Debtor's Plan, which has been confirmed, Fletcher received no distribution by reason of his claim. *See* Plan [ECF No. 1369] at § 5.2(e). In practice, then, the claims allowance process demonstrably did not "necessarily . . . resolve" the Trustee's claims.[6] It is an unnecessary exercise for the Court to conjecture which defenses the Trustee might have argued in objecting to Fletcher's proof of claim, and further, the degree to which they would have overlapped with the Trustee's affirmative causes of action in this adversary proceedings. *Cf Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313 (5th Cir. 2013) ("Because the sole purpose of Frazin's breach of fiduciary duty action was to defeat the Attorneys' fee applications in bankruptcy court, the bankruptcy court necessarily had to resolve every aspect of his breach of fiduciary duty claim to rule on the Attorneys' fee applications.").

Here, the Trustee's common law claims against Fletcher and her objection to Fletcher's proof of claim proceeded on parallel tracks, and the common law claims do not allege to be defenses against Fletcher's proof of claim for administrative fees.

---

[6] That is not to say that the Trustee could not seek to disallow the claim entirely, even at this post-confirmation stage. While "no § 502(d) disallowance claim would lie against a defendant who filed a claim that has been finally disallowed," *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 531 B.R. 439, 455 (Bankr. S.D.N.Y. 2015), a subordinated claim is not disallowed; rather it is relegated to the lowest priority. *See In re Adelphia Commc'ns Corp.,* 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007) ("[S]ubordination and disallowance . . . [are] separate remedies . . . Plainly disallowance is more draconian, and would be appropriate in just a few situations."). However, the Trustee has not sought to amend their complaint to incorporate this relief.

18

A court can undoubtedly enter final judgments on common law claims after making the *post hoc* determination that the factual and legal findings necessary to rule on the objections to a creditor's proof of claims were also sufficient to satisfy the elements of the state-law claims against the creditors.[7]  But, as in this case, where the claims were subordinated without any fact finding, the Court cannot find that these claims were unavoidably resolved in the claims allowance process.[8]  *See In re Penson Worldwide*, 587 B.R. at 21 n.70 ("In Stern, the Supreme Court had the benefit of hindsight in determining what was and was not necessarily resolved in

---

[7] *See, e.g., 13 Holdings, LLC v. Gorilla Cos. (In re Gorilla Cos.)*, 2014 WL 1246358 at *7 (D. Ariz. Mar. 26, 2014) ("[O]nce the Bankruptcy Court litigated the factual basis of whether Gorilla owed additional monies to 13 Holdings under the terms and provisions of the APA, it had also litigated the factual basis of whether 13 Holdings had been unjustly enriched at Gorilla's expense.").

[8] Even if the Court were to construe the Trustee's claims for breach of fiduciary duty as objections or defenses to Fletcher's proof of claim, it is not clear that the Court's decision to disallow Fletcher's claim would have simultaneously and necessarily satisfied each and every element of the Trustee's claims.  *See In re Lehman Bros. Holdings*, 480 B.R at 190 ("[P]artial overlap of the action is insufficient; rather a plaintiff must demonstrate that each factual and legal element of its claim will be decided in the claims allowance process such that after the process, "nothing remains for adjudication in a plenary suit.") (quoting *Katchen v. Landy*, 382 U.S. 323, 334 (1966)).

    Fletcher's proof of claim is for post-petition administrative fees.  The Trustee's claims for breach of fiduciary require findings of fact and legal conclusions regarding events that occurred five years prior to the Debtor's filing up until the date of filing.  Fletcher's proof of claim seeks $10,000.  The Trustee's claims seek damages of over seventy-five million dollars.  The Trustee's claims also require numerous findings of fact and law-of the existence of a fiduciary relationship, that Fletcher breached his duties, and the extent of damages.  There is no question that Fletcher's claim could be disallowed based on a more limited set of findings. *Compare In re Soporex, Inc.,* 463 B.R. 344, 363 (Bankr. N.D. Tex. 2011) ("Count 2 of the Complaint contains a claim against Sabolik for breach of the fiduciary duties of due care and loyalty, while Count 3, against Smith and Sabolik, alleges a claim for corporate waste. In deciding whether Smith and Sabolik are owed unpaid compensation and benefits by Inc. as asserted in their proofs of claim, this Court will not be called upon to decide the Trustee's state law claims against them as pled in Counts 2 and 3.") *with In re Penson Worldwide,* 587 B.R. at 10 ("The basis of Plaintiff's defense to the proof of claim and its affirmative claims is the same.").

    In sum, assuming that the Trustee had postured the claims as objections to the proof of claim, the claims for breach of fiduciary duty would nonetheless require broader findings of fact and law than the claims allowance process would require.  *See In re Lehman Bros. Holdings,* 480 B.R. at 190; *see also Waldman v. Stone*, 698 F.3d 910, 921 (6th Cir. 2012) ("Stone emphasizes that his affirmative claims turn on the same fraudulent conduct as his disallowance claim . . . [based on] same transaction or occurrence as a disallowance claim; "some overlap" between the claims is not enough . . . Stone's affirmative claims required him to prove facts beyond those necessary to his disallowance claims"); *In re Frazin,* 732 F.3d at 323 (Plaintiff's claim was not completely resolved in the claims allowance process because "although the bankruptcy court necessarily had to resolve most, if not all, of Frazin's factual allegations . . . the bankruptcy court was not required to resolve the legal effect flowing from those factual allegations").  Especially in light of the fact that the Trustee resolved Fletcher's proof of claim as an entirely separate matter as part of the Plan confirmation process, the Court concludes that it does not have adjudicative authority to enter final judgment on the Trustee's claims in this adversary proceeding.

19

the claims resolution process. It is harder to make the determination at the outset of the litigation.").

The same analysis applies to Trustee's claims for fraudulent transfer. Fraudulent transfer claims are private rights claims "simply intended to increase payouts to creditors under the confirmed plan." *Kirschner v. Agoglia*, 476 B.R. 75, 81 (S.D.N.Y. 2012); *see also FDIC v. Hirsch (In re Colonial Realty Co.),* 980 F.2d 125, 131 (2d Cir.1992) (*res* sought by an avoidance action is not "property of the estate" until the debtor succeeds in compelling the property's return).

The fraudulent transfer claims do not appear to be objections to Fletcher's proof of claim and therefore do not implicate the claims allowance process. Further, as outlined above, Fletcher's claim was objected to and resolved independent of this adversary proceeding. In short, by filing a proof of claim, Fletcher did not consent to this Court's final adjudication of every fraudulent conveyance claim; rather, at most, Fletcher consented to adjudication of those actions that are intertwined with the process of allowing or disallowing his proof of claim. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 46, 55 (S.D.N.Y. 2013) ("Thus, under *Katchen*, whenever the Bankruptcy Court must resolve a § 502(d) claim brought by the Trustee, it may also finally decide avoidance actions to the extent that those actions raise the same issues as the § 502(d) claim and thus would 'necessarily' be resolved by it.").

## II. **Summary Judgment Standard**

Bankruptcy Rule 7056 controls the procedure for adversary proceedings in bankruptcy, making Rule 56 of the Federal Rule of Civil Procedure applicable to this motion. It is well

settled that on a motion for summary judgment, the moving party bears the initial burden of

showing that the undisputed facts entitle it to judgment as a matter of law. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538

(1986); *see also Estate of Gustafson ex rel. Reginella v. Target Corp.,* 819 F.3d 673, 675 (2d Cir.

2016); *Ferrostaal, Inc. v. Union Pacific R.R. Co.*, 109 F. Supp. 2d 146, 148 (S.D.N.Y. 2000).  In

deciding a summary judgment motion, the court must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *See Matsushita*, 475 U.S. at 587 (1986).

Once the moving party has carried its burden of showing that no material fact is in

dispute and that it is entitled to judgment as a matter of law, the party opposing the motion "may

not rest upon the mere allegations or denials in his pleadings, but . . . must set forth specific facts

showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248,

106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  Rule 56(e) of the Federal Rules of Civil

Procedure applies, where, as is the case here, the party against whom judgment is sought fails to

respond to a summary judgment motion:

> **Failing to Properly Support or Address a Fact**. If a party fails to properly
> support an assertion of fact or fails to properly address another party's assertion of
> fact as required by Rule 56(c) *the court may*:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) *consider the fact undisputed for purposes of the motion*;
>
> (3) *grant summary judgment if the motion and supporting materials – including
> the facts considered undisputed – show that the movant is entitled to it*; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e) (2010) (emphasis added); *see also Vt. Teddy Bear Co. v. 1–800 Beargram*

*Co.*, 373 F.3d 241, 244, 246 (2d Cir. 2004) (noting that the non-movant's failure "allow[s] the

district court to accept the movant's factual assertions as true," provided that the court is "satisfied that the citation to evidence in the record supports the assertion").

This Court's Local Rule 7056-1, which mirrors the District Court's Local Rule 56.1, requires a party moving for summary judgment to include a "separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," Rule 7056-1(b), that "each statement … be followed by citation to evidence which would be admissible," Rule 7056-1(d), and that "each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Rule 7056-1(c). The Trustee has filed a Statement of Undisputed Facts in support of her Summary Judgment Motion [ECF No. 209].

Fletcher failed to respond to the Trustee's Summary Judgment Motion and failed to address the Trustee's Statement of Undisputed Facts. The assertions contained in the Trustee's Statement are uncontroverted and thereby "deemed admitted" for the purposes of ruling on this Summary Judgment Motion. The Court is also satisfied that the underlying evidence supporting the Statements would be admissible at trial. *See. Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.") (quoting *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001)).

### III.  The Trustee's Claims

The Trustee moves for summary judgment on claims numbers three, five and eight in the Amended Complaint, which are claims for breach of fiduciary duty under New York common law, and claims numbers fifteen and eighteen, which are claims for fraudulent transfers under the Bankruptcy Code and New York Debtor and Creditor Law.

### A.  Fiduciary Breach Claims

Under New York law, to recover for a breach of fiduciary duty, the plaintiff must prove (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.  *See Pokoik v Pokoik*, 115 A.D.3d 428, 982 N.Y.S.2d 67 (1st Dep't 2014); *Ozelkan v. Tyree Bros. Envtl. Servs*., 29 A.D.3d 877, 879, 815 N.Y.S.2d 265, 267 (2nd Dep't 2006); *In re Perry H. Koplik & Sons, Inc.*, 499 B.R. 276, 289 (S.D.N.Y. 2013), *aff'd*, 567 F. App'x 43 (2d Cir. 2014).  Based on the undisputed facts, all three elements are satisfied here.

#### 1.  Existence of Fiduciary Relationship

It is undisputed that upon consummation of the Richcourt Acquisition, Fletcher became a director of RHI, the holding company for SCM and RCM, which in turn managed the Richcourt Funds.  Fletcher installed his FAM colleagues, Turner and Kiely, as directors of each Richcourt Fund.  *See* DeConza Dec'l at Exh. 12 (Resolutions of Board of Directors)

As a director, Fletcher unquestionably owed fiduciary obligations to the Funds.  *See Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557, 568 (N.Y. 1984).  He controlled the management of the Funds, and the Funds and their stakeholders were dependent on him to protect their interests.  *See In re Refco Inc. Sec. Litig.,* 826 F. Supp. 2d 478, 502–03 (S.D.N.Y.

23

2011) ("Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another.") (quoting *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976)); *see also EBC I, Inc. v. Goldman, Sachs & Co*., 5 N.Y.3d 11, 19, 832 N.E.2d 26, 31 (N.Y. 2005) (a fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation") (quoting Restatement (Second) of Torts § 874, Comment *a*).

Investment advisers, fund managers and others in control of investment funds also owe fiduciary duties to the funds, much as general partners owe fiduciary duties to limited partners. *See I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 542 (S.D.N.Y. 2017) ("Investment advisors owe a fiduciary duty to the clients they advise") (quoting *Rasmussen v. A.C.T. Envtl. Servs. Inc*., 292 A.D.2d 710, 712, 739 N.Y.S.2d 220, 222 (3rd Dep't 2002)); *Bullmore v. Banc of America Securities LLC,* 485 F. Supp. 2d 464, 468-69 (S.D.N.Y. 2007); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 3*51 F. Supp. 2d 79, 102 (S.D.N.Y.2004) (collecting cases). This is especially so where, as here, Fletcher had broad discretion to manage the other directors of the Funds. *See* Stmt. of Facts at ¶ 25-31.

This Court finds that Fletcher owed fiduciary duties to the Funds at all times relevant to the actions and events of which the Trustee complains.

2.  Breaches of Fiduciary Duty

The fiduciary duties owed by investment advisers and fund managers include the duty of loyalty and the duty of care. *See Norlin Corp. v. Rooney, Pace Inc*., 744 F.2d 255, 264 (2d Cir. 1984) (traditional fiduciary duty consists of the duties of care and loyalty); *Official Comm. of*

*Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 2002 WL 362794, at *8-9

(S.D.N.Y. Mar. 6, 2002) (investment advisers owe "duties of care, disclosure and loyalty" to

their clients); *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs., Ltd.,* 2003 WL 21263544, at *4

(S.D.N.Y.) (fund administrator had "a fiduciary duty to all Fund shareholders to implement all

trades on behalf of those shareholders and to report the status of each shareholder's account

accurately").

As a fiduciary, a fund manager must place the fund's interests before its own while

exercising due care in the decision-making process.  *See Anwar v. Fairfield Greenwich Ltd.,* 728

F. Supp. 2d 372, 441-42 (S.D.N.Y. 2010) (refusing to dismiss claim based on failure of service

provider "to take whatever action necessary" to protect assets invested with Madoff); *Paige

Capital Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 Del. Ch. LEXIS 116, at *110 (Del. Ch.

Aug. 8, 2011) (a general partner, as manager of a hedge fund, owes fiduciary duties to limited

partners as investors and must act with a good faith belief that it is advancing the best interests of

the fund and its investors).

The Trustee asserts breach of fiduciary duty claims based on three specific alleged

breaches by Fletcher: (1) Fletcher's failure to disclose the Richcourt Acquisition (*see* Amended

Complaint at ¶ 326-358); (2) the first three post-acquisition defalcations by Fletcher (*see id.* at ¶

374-405); and (3) the New Year's Eve transaction and related agreements (*see id.* at ¶ 421-438).

In her Motion for Summary Judgment, the Trustee addresses the second and third causes of

action together.

25

a. *Failure to Disclose Richcourt Acquisition
and Subsequent Misrepresentations*

It is axiomatic that a fund manager must always fully disclose material information to investors. *See Dubbs v. Stribling & Assoc.,* 96 N.Y.2d 337, 341, 728 N.Y.S.2d 413, 752 N.E.2d 850 (N.Y. 2001) (fiduciaries have a duty to "disclose any information that could reasonably bear on plaintiffs' consideration" of a transaction); *Alpert,* 63 N.Y.2d at 569, 483 N.Y.S2d at 674 (holding that fiduciaries owe a duty of candor); *Globe Woolen Co. v. Utica Gas & Electric Co.*, 224 N.Y. 483, 490, 121 N.E. 378, 380 (N.Y. 1918) (Cardozo, J.) ("There must be candor and equity in the transaction."); *see also Wendt v. Fischer,* 243 N.Y. 439, 443, 154 N.E. 303 (N.Y. 1926) (especially where there is conflict of interest, "disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance").

Withholding material information from investors or others may be as wrongful as affirmatively misrepresenting such information. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179, 944 N.E.2d 1104, 1108 (N.Y. 2011) (fiduciaries cannot omit material information). Subsequently learning that earlier communications were false and failing to correct them also may be a breach of the duty of loyalty because of a lack of candor. *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010) (recognizing "a continuing duty to update or correct past statements when they became known to be misleading").

The Court finds that Fletcher breached his fiduciary duty to the Funds by failing to disclose the Richcourt Acquisition and thereafter misrepresenting details regarding the Acquisition. The first notice of Fletcher's taking control not was provided until December 2008, over five months after the Acquisition, and both that notice and the January 2009 letter contained misleading information regarding the management structure of the Funds. The Trustee pleads the plausible interpretation of the Letters' misrepresentation, that Fletcher aimed to delay

investors from questioning the management structure and financial condition of the Funds, so that he could maintain control and discretion over the Funds' assets. *See Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 364 (S.D.N.Y. 2013) ("[N]ondisclosure benefitted defendants because it permitted the continuation of undisclosed payments.").

Fletcher's failure to provide the Richcourt Funds and their investors with all relevant and truthful information about the highly material Richcourt Acquisition deprived them of the opportunity to divest from the Funds in response to the change in management structure and decision-making authority. *See Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 279, 952 N.E.2d 995, 1002, 929 N.Y.S.2d 3, 10 (1st Dep't 2011) ("In certain circumstances, a fiduciary's disclosure obligations might effectively operate like a written representation that no material facts are undisclosed."). Citco had managed the Funds since their inception and Fletcher was an unknown entity. The Court concludes based on these undisputed facts that in disseminating the misrepresentations in the December 2008 and January 2009 Letters, Fletcher failed to act in the Funds' interests, and thereby breached his duties of loyalty and candor owed to the investors.

b.  *The New Year's Eve Transaction and other Post-Acquisition Defalcations*

It is similarly beyond dispute that a fund manager must avoid conflicts of interests. *See Pokoik* 115 A.D.3d at 429, 982 N.Y.S.2d at 70 ("This is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.") (quoting *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746, 539 N.E.2d 574 (N.Y. 1989)).

27

Generally, a conflict exists where a manager is on "both sides" of a proposed transaction. *See In re Perry H. Koplik.*, 476 B.R. at 808-09. A director is also considered "self-interested" in a transaction where he or she "will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016). Once a *prima facie* showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders. *See Norlin Corp,* 744 F.2d at 264 (citing N.Y. Bus. Corp. Law § 713 (McKinney)). "It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply." *In re Croton River Club. Inc.,* 52 F.3d 41, 44 (2d Cir.1995) (applying New York law).

The Court concludes based on the undisputed factual record that Fletcher was on both sides of the New Year's Eve Transaction, in breach of his duty of loyalty. Fletcher controlled and was a director for FII (the entity that received $4 million from Soundview Elite), while at the same time he controlled and was a director for Soundview Elite (the entity that transferred $4 million to FII and received worthless securities). *See* DeConza Dec'l, Exh. 13 Fletcher Tr. at 83:25-85:4.

Where a fiduciary is self-interested, the Court must engage in "a two-pronged inquiry into the fair process and the fair price of the transaction." *Pereira v. Cogan*, 294 B.R. 449, 526 (S.D.N.Y.2003), *vacated and remanded on other grounds*, 413 F.3d 330 (2d Cir. 2005). *See also In re Perry H. Koplik,* 476 B.R. at 803 ("Where officers or directors of a corporation considering a transaction are not disinterested and have a personal stake in the outcome . . . they must show the entire fairness of the transaction, or that it is intrinsically fair.") (quotations omitted); *Alpert*,

63 N.Y.2d at 570-71, 483 N.E.2d at 670 (N.Y. 1984) ("[W]hen there is an inherent conflict of interest, the burden shifts to the interested directors or shareholders to prove good faith and the entire fairness of the merger.").

The Court finds that the transaction was both procedurally and substantively deficient. Fletcher has not provided any evidence or argument to satisfy his burden of proving the entire fairness of the New Year's Eve Transaction. The transaction was procedurally unfair to the Funds because Fletcher blatantly failed to "ma[k]e the necessary investigation and undert[ake] due deliberation with respect to the decision." *In re Perry H. Koplik*, 476 B.R. at 803. When conflict exists, it is incumbent on managers to pursue approval from disinterested directors in order to determine whether a conflicted transaction is proper. *See In re Kenneth Cole Prods., Inc.,* 27 N.Y.3d 268, 274, 52 N.E.3d 214, 218 (N.Y. 2016). The undisputed facts in this case demonstrate that Fletcher caused Soundview Elite to pay for an equity interest in the bankrupt FII based on a valuation provided by Fletcher and his affiliate RF Services, and that Fletcher did not receive an independent appraisal of the FILB equity stake in connection with this transaction. Stmt. of Facts at ¶ 74-78. *See Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 974 (2d Cir. 1989) ("There has been no evidence of 'arm's length negotiations,' competitive bidding, or review and approval by the limited partner.").

Substantively, the terms of the transaction cannot be defended. *See In re Croton River Club,* 52 F.3d at 44. Soundview received no value in return for the $4 million it paid to FII in connection with the transaction. The equity stake in FILB that Soundview purchased under Fletcher's direction was essentially worthless. *See* Varga Dec'l. at ¶ 18. At the time, FILB was in bankruptcy, and there was no indication that its assets would be sufficient to pay off its liabilities, let alone allow for payments to equity holders (who take last, only after all creditors

29

are paid, *see* 11 U.S.C. § 726). *See* DeConza Dec'l., Exh. 13 (Fletcher Tr.) at 77:4-75:11. The

FILB shares were ultimately extinguished following the FILB chapter 11 plan confirmation.

Varga Dec'l. at ¶ 18. Thus, the undisputed facts clearly establish that the $4 million transfer

brought in no consideration for Soundview, and that Fletcher's decision to execute the

transaction cannot be defended on its merits.

On these facts, the Court concludes that the New Year's Eve Transaction was patently

deficient and unfair, and constituted a breach of Fletcher's duty of loyalty. *See In re Perry H.*

*Koplik*, 476 B.R. at 803 ("Self-dealing transactions . . . constitute paradigmatic examples of

breaches of the duty of loyalty.").

### c. Other Post-Acquisition Defalcations

According to the undisputed facts, starting in November 2008, after acquiring the

Richcourt Funds and seeing the line of credit to his other funds disappear, and continuing until

March 2010, Fletcher also caused the Richcourt Funds to transfer a total of $61.7 million in cash

into various Fletcher Funds. *See* Stmt. of Facts at ¶ 39; DeConza Dec'l, Exh. 5 at 223. These

"investments" similarly provided little or no benefit to the Richcourt Funds.

The Court concludes that these transfers also constituted self-dealing in breach of

Fletcher's duty of loyalty. The Court finds that Fletcher represented both sides of each

transaction, and further that the investments provided little or no benefit to the Richcourt Funds.

Fletcher made transactions using the Richcourt Funds' assets for personal gain, to sustain his

Fletcher Funds and earn significant management fees. Fletcher persistently exploited his

fiduciary responsibilities by using Fund assets for his own self-interest. He is therefore liable for

the resulting damage to the investors.

30

3. <u>Damages</u>

As with any other action sounding in tort, a claim for breach of fiduciary duty requires a showing of harm flowing from the breach.  However, courts have accepted a lower standard for proving causation in the case of fiduciary breach actions.  *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) ("[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages.").  The Trustee therefore does not bear the burden of showing strict "but for" causation or proximate cause in her claims for fiduciary breach, according to what is known as the "prophylactic rule."  *Id.*

The relaxed standards of the "prophylactic rule" reflect the correspondingly strict duties of fiduciaries, and courts are inclined to treat breaches harshly in order to disincentive them.  *See Gibbs v. Breed, Abbott & Morgan*, 271 A.D.2d 180, 189, 710 N.Y.S.2d 578, 584 (1st Dep't 2000) ("[T]he purpose of this type of action is not merely to compensate the plaintiff for wrongs committed . . .  [but also] to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit").  Once the act of fiduciary breach is established, "uncertainties in fixing damages will be resolved against the wrongdoer."  *Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir. 1985).  *See also Bank of Am. Corp. v. Braga Lemgruber*, 2007 WL 4548298, at *8 (S.D.N.Y. July 10, 2007) ("[A]ny doubt or ambiguity with respect to Plaintiffs' damages should be resolved against the [] Defendants.").  In order to recover, plaintiffs must, at a minimum, establish that the breach was a "substantial factor" in causing an identifiable loss.  *See Gibbs*, 271 A.D.2d at 189, 710 N.Y.S.2d at 584.

In cases involving breaches of fiduciary duty in managing investment funds, damages are established and losses are measured by calculating "the difference between the plan's actual

31

performance and how the plan would have performed if the funds had been invested like other funds being invested during the same period in proper transactions." *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016) (citing *Donovan*, 754 F.2d at 1056) (quotations omitted). *See also Scalp & Blade, Inc. v. Advest, Inc.*, 309 A.D.2d 219, 229, 765 N.Y.S.2d 92, 99–100 (4th Dep't 2003) ("Many federal decisions . . . support the award of lost appreciation (or excess depreciation) damages for the mismanagement of an investment portfolio, provided that there has been a breach of trust extending beyond mere negligence and committed for the personal gain of the fiduciary."); *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 659 (S.D.N.Y. 2012) ("This calculation provides a reasonable approximation of the position [the Plans] would have occupied but for the breach of trust."); Restatement (Second) of Trusts § 205(c) (1959). This method is intentionally harsh to breaching defendants. *See Donovan*, 754 F.2d at 1056 ("Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these.").

In this case, the Trustee does not seek separate awards of damages stemming from each act of fiduciary breach by Fletcher, or restitution for specific funds that were defalcated. Rather, the Trustee's theory of damages, supported by the declaration of its expert, Mr. Varga, is based on the aggregate losses suffered by the Richcourt Fund as a result of Fletcher's continued mismanagement of the Funds from the date of the Richcourt Acquisition in 2008 through the date of filing of bankruptcy in 2013.

First, by failing to inform investors of the change in the Fund's management following the Acquisition, Fletcher prevented investors from considering the option of withdrawing their investments, which they had knowingly entrusted to only Citco. Next, and most significantly,

the Trustee alleges Fletcher should have liquidated the funds shortly after the Acquisition, when the Funds' line of credit was terminated without replacement while the Fund was facing significant redemption requests from investors. *See* Stmt. of Facts at ¶ 35-36; DeConza Dec'l, Exh. 5 at 77. Without outside lines of credit, the Funds would be forced to pay down expired lines of credit by using assets that otherwise would be used to redeem clients. Stmt. of Facts at ¶ 37; Varga Dec'l at ¶ 7. The Trustee's theory of damages, supported by the Varga affidavit, is that a prudent manager, facing mounting redemption requests from investors in late 2008 and early 2009 and insufficient credit to satisfy the redemptions, would have sought to liquidate the Funds to avoid further losses. Instead, in an effort to maintain the Funds and preserve his management fees Fletcher created a special purpose vehicle that effectively forced investors to accept periodic payments instead of the entire redemption request. *See* Stmt. of Facts at ¶ 52-57; Varga Dec'l at ¶ 8-9. These actions only built higher the house of cards, and were clearly undertaken for Fletcher's short-term benefit, in violation of his duty of loyalty to the Fund's investors. *See In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 183 (S.D.N.Y. 2014) ("These defendants knew of the liquidity crisis and its increasing impact on the firm's excess share of customer accounts. Even in light of that knowledge, they continued to transfer money [] to [defendant's] other operations as part of [their] 'shell game.'").

The record is clear that over the same period, Fletcher misrepresented his role in the management of the Funds in his December 2008 and January 2009 letters, further depriving investors of material information and withholding any reason to investigate further. Instead of winding down the Funds, Fletcher continued to operate and (mis)manage them for years, siphoning millions in cash from the Funds for investment in his other Fletcher Funds (Stmt. of Facts at ¶ 39) and plainly misappropriating large sums of money in pursuit of self-interest (*see,*

33

*e.g.,* the New Year's Eve Transaction, Stmt. of Facts at ¶ 58-83). These actions were not the result of mere "error of investment judgment," *In re Bank of New York,* 35 N.Y.2d 512, 519, 323 N.E.2d 700, 704 (N.Y. 1974), but rather calculated and self-interested decisions by Fletcher to sustain control of the Funds for his own pecuniary benefit. In light the glaring conflicts of interest inherent in any transaction between the Fletcher-managed Richcourt Funds and the Fletcher-managed Fletcher Funds, conclusions about Fletcher's role in causing the Fund's injuries should be construed liberally against him. *See Estate of Re v. Kornstein Veisz & Wexler*, 958 F. Supp. 907, 927-28 (S.D.N.Y. 1997) ("Viewed through the lens of a potential conflict of interest, defendants' otherwise defensible tactical decisions take on a more troubling gloss, and suggest at the least the possibility that defendants' divided loyalties substantially contributed to [plaintiff's alleged harm].").

The Court finds that the chain of breaches described above were a "substantial factor" in the eventual losses to investors. A prudent manager acting in accordance with his or her duties of loyalty and care would have taken steps to liquidate the funds in late 2008 to avoid further losses. *See In re Baker's Estate*, 249 A.D. 265, 268, 292 N.Y.S. 122, 128 (4th Dep't 1936). Pursuant to the "prophylactic rule," the Court finds Fletcher responsible and liable for the entirety of damages that flowed from his intentional failure to act prudently and loyally with regards to the Funds. *See Malmsteen v. Berdon, LLP,* 369 F. App'x 248, 251 (2d Cir. 2010) ("Because '[a]n action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of breach,' there need not be "but-for" causation between the breach and the asserted damages.") (quoting *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995–96 (2d Cir.1983)).

34

The Trustee relies on the declaration of Geoffrey Varga (the "Varga Dec'l."), the

financial consultant of the Chapter 11 Trustee, for the computation of damages.  Varga states that

as a result of the various breaches and misrepresentations and defalcations, the Funds suffered

losses of approximately $78 million.  Varga Dec'l. at ¶ 19.  Varga computed the alleged damages

by first estimating the returns from a hypothetical liquidation of the Funds' portfolios during late

2008 until early 2009 (when Fletcher should have taken affirmative steps to wind down the

funds), and comparing that number to the actual amounts investors recovered in the five-year

period leading up to the bankruptcy/ liquidation of the Funds in mid-2013.  *Id.*  Varga takes into

account the global market decline during the financial crisis in late fall 2008, estimating a 15%

expected drop in total asset value during that period, and further assumes that the Funds'

portfolio would only have been able to realize 90% of its market value if liquidated in late 2008

or early 2009.  *Id.*  Varga concludes that the portfolios could have provided a total of $681

million for investors, if liquidated prudently.  Varga reviewed bank statements during the

relevant time period and found that investors in fact received a total of $603 million in the years

leading up to the 2013 bankruptcy filing, leaving a deficit of $78 million, which he attributes to

Fletcher's fiduciary breaches.  *Id*

The Court finds Varga's methodology sufficient to establish the amount of damages

flowing from Fletcher's breaches of duty.  *See, e.g., Matter of Janes,* 90 N.Y.2d 41, 55, 681

N.E.2d 332, 339, 659 N.Y.S.2d 165, 172 (N.Y. 1997) ("In imposing liability upon a fiduciary on

the basis of the capital lost, the court should determine the value of the stock on the date it should

have been sold, and subtract from that figure the proceeds from the sale of the stock or, if the

stock is still retained by the estate, the value of the stock at the time of the accounting.").  In New

York State, to recover damages in a fiduciary action, one must prove with "reasonable certainty,

35

though not mathematical precision, the amount of loss." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 908 (2d Cir. 1998). Varga's methods are facially reasonable and, additionally, his decades of experience in the field of insolvency accounting would surely qualify him as an expert at trial.[9] *See* Varga Dec'l. at ¶ 3.

Many decisions in this circuit have relied on similar methodologies that estimate hypothetical values in order to calculate damages in fiduciary actions. *See, e.g., S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852-854 (2d Cir. 1987); *Enright v. New York City Dist. Council of Carpenters Welfare Fund*, 2013 WL 3481358, at *18 (S.D.N.Y. July 10, 2013); *In re Perry H. Koplik.,* 476 B.R. at 791-92; *accord Wolf v. Rand*, 258 A.D.2d 401, 402, 685 N.Y.S.2d 708, 710 (1st Dep't 1999); *see also In re Signature Apparel Grp. LLC,* 577 B.R. 54, 109 (Bankr. S.D.N.Y. 2017) ("[D]amages resulting from a breach of fiduciary duty are liberally calculated. As long as there is a basis for an estimate damages, and the plaintiff has suffered harm, 'mathematical certainty is not required.'") (regarding Delaware law).

The Court accepts Varga's calculation of losses, especially in light of the fact that his methods are reasonable and are not controverted by any opposing or alternative calculations submitted by Fletcher. *See Venizelos v. Oceania Mar. Agency, Inc.,* 268 A.D.2d 291, 292, 702 N.Y.S.2d 17, 18 (N.Y. 2000) ("Since a breach of fiduciary duty was proved, the [trial] court may be accorded significant leeway in ascertaining a fair approximation of the loss ... so long as the court's methodology and findings are supported by inferences within the range of permissibility."); *see also Donovan*, 754 F.2d at 1056; *Herman v. Feinsmith,* 39 A.D.3d 327,

---

[9] Mr. Varga appeared at the hearing on the Trustee's Motion for Summary Judgment and was prepared to testify with regard to the subject matter of his declaration. No one appeared for Defendant Fletcher or expressed a desire to cross-examine Mr. Varga. The Court therefore accepted Counsel's proffer regarding Mr. Varga's testimony together with Mr. Varga's declaration in support of the Trustee's Motion for Summary Judgment.

328, 834 N.Y.S.2d 140, 141 (1st Dep't 2007); *Oshrin v. Hirsch*, 6 A.D.3d 352, 354, 776

N.Y.S.2d 545, 546 (1st Dep't 2004).

### B. Claims for Fraudulent Transfers

The Trustee also seeks summary judgment against Fletcher for his receipt of constructive

fraudulent transfers in 2013 in the aggregate amount of $91,667 ($31,667 received on January 1,

2013 and $60,000 on April 8, 2013).  She argues two overlapping causes of action to avoid these

transfers, alternatively under Section 548(a)(1)(B) or under Section 544 of the Bankruptcy Code.

Both theories rely on Section 550(a) for statutory support giving the trustee the ability to initiate

proceedings to recover property from a transfer that is avoided under Section 548 or 544.

Section 548(a)(1)(B) permits a trustee to avoid transactions made within two years of the

bankruptcy filing if the debtor failed to receive reasonably equivalent consideration in exchange

for the transfer, provided certain conditions are present.[10]  Among those conditions are that the

debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer, 11

U.S.C. § 548(a)(1)(B)(ii)(I), or that the transfer was made specifically to an insider under an

employment agreement and not in the ordinary course of business.  548(a)(1)(B)(ii)(IV).  Section

544 of the Bankruptcy Code, the Trustee's alternative authority, permits a trustee to bring

fraudulent transfer claims on behalf an estate when such claims could be brought under state law

---

[10] The statute provides, in relevant part:
(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .
    (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . .
        (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; [or]
        (ii)(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.
11 U.S.C. § 548(a)(1)(B).

by an entity that was a creditor at the time of the transfer. The Trustee relies on Sections 273, 274, 275, 278, and 279 of the New York Debtor and Creditor Law for the underlying state law causes of action for fraudulent conveyances.

In order to recover under Section 548(a)(1)(B)(ii)(I), a plaintiff must show that: (1) the transfer occurred within two years of the date of filing a petition, (2) the debtor received less than a reasonably equivalent value in exchange for the transfer, and (3) the debtor was insolvent at the date of the transfer or became insolvent as a result of the transfer. 11 U.S.C. § 548(a)(1)(B)(ii)(I).

As evidentiary support of the transfers, the Trustee cites to Exhibit 2 to the Amended Complaint, a spreadsheet showing outgoing transfers from Soundview Elite from 2011 until its filing for bankruptcy. *See* ECF No. 52, Exh. 2 at 39. The exhibit evidences transfers to Fletcher in the alleged amounts and during the stated timeframes. The Trustee also relies on the declaration of the Trustee's expert, Mr. Varga, in support of the fraudulent conveyance claims. Varga's conclusions, based on firsthand "review and analysis of Soundview Elite's books and records," (Varga Dec'l. at ¶ 9), are not contradicted by any opposing evidence.

The Court finds that the Trustee has met her burden under Section 548(a)(1)(B) to prove the two fraudulent transfers. First, the transfers undoubtedly occurred within two years of the Soundview bankruptcy filing. Both transfers took place in early 2013 (*see* ECF No. 52, Exh. 2 at 39; Varga Dec'l. at ¶ 22) and Soundview filed a bankruptcy petition later that same year, on August 31, 2013. Main Case, ECF No. 1. Second, according Varga's expert testimony, "Soundview Elite did not receive fair (or any) consideration for these transfers." Varga Dec'l. at ¶ 23. Third, Varga concluded, based on Soundview's books and records and taking into account the significant number of outstanding redemption requests, that Soundview was insolvent at the time Fletcher received the transfers. *Id.*

The Court concludes that the Trustee is entitled to summary judgment on her claims for

fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code.[11]  However, by the

Trustee's own admission (*see* Reply Brief at 7), the damages stemming from the fraudulent

transfer claims are subsumed within the $78 million dollars in damages stemming from the

fiduciary breach claims.  Because the Court finds Fletcher liable for the entirety of Debtor's

decline in value during the period between the Richcourt Acquisition and the filing date,

Debtor's damages from the fraudulent transfers are included in that calculation.  The Trustee

does not seek, and cannot recover, duplicative damages.  *See id.*

C.  Interest

The Trustee requests that the Court award pre-judgment interest at a rate of nine percent

per annum based on New York CPLR §§ 5001(b) and 5004, with interest accruing from the time

that Fletcher prudently should have begun to liquidate the funds in January 2009, after the

market had begun to stabilize following the collapse of Lehman Brothers in late 2008.  *See*

Varga Dec'l. at ¶ 20; Reply Brief at 7 n.3.  CPLR 5001(b) provides that "[i]nterest shall be

computed from the earliest ascertainable date the cause of action existed, except that interest

upon damages incurred thereafter shall be computed from the date incurred."

The Court concludes that the Trustee is entitled to interest at the New York statutory rate.

The Trustee's damages award for fiduciary breach are based on state common law claims, and as

such, New York state interest laws should apply.  *See Strobl v. New York Mercantile Exch.*, 590

---

[11] The Trustee does not make a separate argument in favor of a ruling under Section 544 or Section 548(a)(1)(B)(ii)(IV) in her Motion for Summary Judgment and the Court does not need to analyze those causes of action, since any relief requested pursuant to those additional claims would be duplicative of Fletcher's established liability under Section 548(a)(1)(B).

F. Supp. 875, 881 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985).[12]  Under New York law,

pre-judgment interest is awarded as a matter of right pursuant to CPLR 5001(a) for causes of

action sounding in law or tort.  *See, e.g., Huang v. Sy*, 62 A.D.3d 660, 661–62, 878 N.Y.S.2d

398, 400 (2nd Dep't 2009) ("the Supreme Court properly awarded pre-verdict interest as a matter

of right pursuant to CPLR 5001(a) . . . [on claims to] recover damages for fraud and breach of

fiduciary duty").  In contrast, it is within the Court's discretion to award pre-judgment interest on

equitable claims.  *Woerz v. Schumacher,* 161 N.Y. 530, 537–38, 56 N.E. 72 (N.Y. 1900)

("[U]pon demands bearing interest at law, the court of equity is bound to allow it; but where the

demand does not bear interest at law, it will or will not be allowed according to the equity of the

case, in the discretion of the court.").

Even if the Trustee's claims and remedies for fiduciary breach sounded in equity (*i.e.,* if

her theory of damages relied on claims for disgorgement or unjust enrichment), this Court would

still be inclined to award prejudgment interest.  Interest is not considered a penalty and is not

designed to punish the liable party, but rather to compensate the plaintiff for the loss of funds

ultimately owed during a certain period of time.  *See J. D'Addario & Co., Inc. v. Embassy*

*Industries, Inc.*, 20 N.Y.3d 113, 957 N.Y.S.2d 275, 980 N.E.2d 940 (N.Y. 2012).  Here, where

the Trustee's damages stemmed from fiduciary breaches that deprived them of proper use of

funds to which they were entitled, retroactive compensation for their dispossession of these funds

in the form of interest is appropriate.  *See Sexter v. Kimmelman, Sexter, Warmflash & Leitner*, 43

A.D.3d 790, 795, 844 N.Y.S.2d 183, 188 (1st Dep't 2007) (holding that pre-judgment interest is

---

[12] In contrast, the decision to grant or deny prejudgment interest on claims arising under federal law is within the sound discretion of the district court.  *Strobl*, 590 F. Supp. at 881.  The fraudulent transfer judgments, awarded pursuant to § 548 of the Bankruptcy Code, were awarded under federal law.  *See In re 1031 Tax Grp.*, LLC, 439 B.R. 84 (Bankr. S.D.N.Y. 2010).  However, as discussed above, this award is subsumed by the awards for the fiduciary breach claims and no independent damages should be awarded by reason of the fraudulent transfers.

"virtually mandated," even in actions that are equitable in nature, "where fiduciaries failed to properly account for many years, during which time the fiduciary enjoyed the benefit of the injured [party's] money") (quotations omitted); *Eighteen Holding Corp. v. Drizin*, 268 A.D.2d 371, 372, 701 N.Y.S.2d 427 (1st Dep't 2000) ("[E]ven if plaintiff's action had been equitable, the . . . award of prejudgment interest would nonetheless have been proper in light of the circumstance that defendants wrongly withheld plaintiff's money.").

The Court therefore concludes that the Trustee is entitled to judgment in the amount of $78 million on her breach of fiduciary duty claims, <u>plus</u> pre-judgment interest at a rate of nin percent per annum,[13] together with costs and post-judgment interest.  (*See* Varga Dec'l. ¶¶ 19-20).

## IV.  <u>Fletcher's Counterclaims</u>

In his Answer, Fletcher asserts a number of counterclaims. They include:

(1) Seeking a full review by a Fee Examiner of expenses and fees paid by the Trustee (which Fletcher asserts are excessive and cannot be justified) and disgorgement of any excessive fees;

(2) Relief for "undisclosed conflicts of interest" between the Trustee and her Professionals;

(3) Relief for (i) the Trustee's redaction of employee information; (ii) the Trustee's failure to identify a corporation that directly or indirectly owns 10% or more of the equity interests of one or more of the Funds; and (iii) that certain professional fee invoices were redacted;

(4) Relief regarding blocked access to bank accounts, which is allegedly preventing from retaining counsel;

---

[13] Under New York law, prejudgment interest is calculated on a simple interest basis, without compounding interest. *See Long Playing Sessions, Inc. v. Deluxe Labs., Inc.,* 129 A.D.2d 539, 540, 514 N.Y.S.2d 737, 738 (1st Dep't 1987); Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 90 (2d Cir.1998).

(5) Relief related to the actions of Deborah Midanek (a non-party to this action) that allegedly caused damage to the Funds;

(6) Request for payment of Fletcher's administrative claim in the underlying Soundview bankruptcy case.

Answer at ¶ 23-28.

The Trustee responded to these counterclaims in her Answer to Counterclaims [ECF No. 44]. The Court concludes that the Trustee is entitled to summary judgment dismissing all of Fletcher's counterclaims. Each of the counterclaims is subject to dismissal either because it fails to state a claim upon which relief can be granted because it is asserted against parties not involved in this adversary proceeding, or because the issue raised had previously been litigated and decided in earlier bankruptcy proceedings and is therefore barred by the law of the case doctrine. Although a court has the discretion to revisit its own prior decision, a court "should [be] loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S. Ct. 2166, 2178, 100 L. Ed. 2d 811 (1988) (quotations and citations omitted). Fletcher's counterclaims offer no new evidence or arguments that would persuade the Court to reconsider its prior rulings from earlier bankruptcy proceedings.

Counterclaim No. 1    Seeking review of excessive fees paid by the Trustee to various professionals

Fletcher asserts that the fees paid to the Trustee's Professionals and the Fund Liquidators cannot be justified. Answer at ¶ 23. As examples, he points to the fees of $1.9 million for the Trustee's various investigations into the Debtor and $3.4 million paid to the Liquidators as unreasonable. *Id.* at ¶ 31-32.

This Court previously considered objections regarding Trustee expenses, including an objection by co-defendant and insider George Ladner [Main Case, ECF Nos. 387 and 392], and ultimately overruled the objections in granting the Trustee's Motion for an Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals [Main Case, ECF No. 405]. As such, Fletcher's first counterclaim is barred by law of the case and is not subject to re-litigation. *See McGee v. Dunn*, 940 F.Supp.2d 93, 100 (S.D.N.Y. 2013) ("The objective of the law of the case doctrine includes promoting efficiency and avoiding endless litigation by allowing each stage of the litigation to build on the last and not afford an opportunity to reargue every previous ruling."). Moreover, in connection with the confirmation of the Plan, the Court previously approved the Chapter 11 Trustee's professionals' fees on a final basis [Main Case, ECF Nos. 1556-58 and 1569]. Notice of the application for fees was given [Main Case, ECF No. 1533] and Fletcher did not object. These rulings "either expressly resolved [the] issue or necessarily resolved it by implication," *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001), and Fletcher has offered no new evidence or arguments to convince the Court to reconsider its prior decisions. Accordingly, Counterclaim One is barred by the law of the case doctrine and should be dismissed.

<u>Counterclaim No. 2</u>    Asking the Court to investigate alleged conflicts of interest involving the Trustee and her Professionals

Fletcher seeks to have the Trustee removed or investigated due to purported conflicts of interest. In his second counterclaim ("Counterclaim Two"), Fletcher asserts that the Trustee's professionals failed to disclose conflicts of interest in direct violation of Bankruptcy Rule 2014 and 11 U.S.C. § 327. Answer at ¶ 33.

43

This claim is similarly barred by prior rulings by this Court. Fletcher failed to object to the Trustee's Application to Employ Counsel [Main Case, ECF No. 176] and a Financial Consultant [Main Case, ECF No. 205]. On March 13 and 20, 2014, the Court entered Orders Authorizing Trustee to Retain Counsel and Financial Consultant [Main Case, ECF Nos. 220 and 233]. The Court's orders approved the employment of the Trustee's Professionals, and Fletcher has offered no "cogent" or "compelling" reasons in his Answer to convince the Court to reconsider its prior approval. *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008).

Further, Gerti Muho, a Fletcher associate and a co-defendant in the Trustee's adversary proceeding, previously moved to have the the Trustee removed as Chapter 11 Trustee of the Debtor [Main Case, ECF No. 291], and Fletcher previously argued the alleged conflicts reiterated in his Answer in a statement filed with the Court in support of the Muho motion [Main Case, ECF No. 302]. This Court denied the motion to remove the Chapter 11 Trustee [Main Case, ECF No. 306]. Counterclaim Two is therefore barred by law of the case, and the Court sees no reason to reconsider its prior orders. *See In re Bennett Funding Grp., Inc.,* 367 B.R. 302, 325 (Bankr. N.D.N.Y. 2007) (Court would not consider defendant's counterclaim against the chapter 11 trustee alleging conflicts of interest by the trustee, where the court had previously entered an order denying the removal of the trustee).

<u>Counterclaim No. 3</u>    Seeking disclosure of the identity of corporations that directly or indirectly own 10% or more of the equity interests of one or more of the Funds

On October 2, 2014, the Trustee filed an *ex parte* motion to authorize the Trustee to redact certain information about investors, pursuant to Cayman Island law [Main Case, ECF No. 368]. George Ladner, a colleague of Fletcher's and co-defendant in this case, objected to the Trustee's motion [Main Case, ECF No. 370] under the same legal theory that Fletcher asserts in

44

his counterclaim.  At a hearing on November 6, 2013 [Main Case, ECF No. 403 at 7-9], this

Court ruled on Ladner's objection and granted the Trustee's motion.  Fletcher acknowledges in

his Answer that the Court previously granted the Trustee's motion.  Answer at ¶ 25.  The Court

in its discretion will "avoid time-consuming relitigation of issues already decided."  *Liani v.*

*Baker*, 2010 WL 2653392, at *11 (E.D.N.Y. June 28, 2010).   Counterclaim Three should be

dismissed.

Counterclaim No. 4    Seeking removal of restriction on Fletcher's access to Soundview banking
                     accounts to allow him to retain counsel

Fletcher claims that "[t]his Court has systematically blocked the Fletcher . . . Defendant[]

from retaining counsel," Answer at ¶ 37, by blocking his access to funds held in a Delaware

Bank, in excess of the Court's jurisdictional authority.  *Id* at ¶ 12

This claim fails to state a claim upon which relief can be granted because, *inter alia,* it is

asserted against the wrong parties.  Fed. R. Civ. P. 12(b)(6); *see Mercator Corp. v. Windhorst,*

159 F. Supp. 3d 463, 471 (S.D.N.Y. 2016) (dismissing claim raised against improper party for

failure to state a claim).  The Court is not a party to the adversary proceeding, and the

counterclaim does not raise any claims against the Trustee or Plaintiff.  Counterclaim Four is an

inappropriate mechanism to address Fletcher's requested relief.  Moreover, the Court's prior

rulings blocking access to Soundview's assets were entirely justified and it will not be revisited.

*See, e.g.,* Decision on Motions for Summary Judgment and Asset Freezing Preliminary

Injunction [Adv. Proc. No. 14-019323, ECF No. 88].  Counterclaim Four should be dismissed.

Counterclaim No. 5    Requesting that non-party Midanek disclose fees and expenses paid to
                     herself and others during the liquidation of the Funds and return those
                     amounts to the Debtor

Prior to filing, from March 26 through June 19, 2013, Solon Group, Inc. ("Solon"), a U.S. entity, served as a the only non-management director of the Richcourt Funds. *See* DeConza Dec'l, Exh. 21 (May 28, 2013 Letter from Midanek to Cayman Islands Monetary Authority). On May 28, 2013, Deborah Midanek, the president of Solon, wrote to the Cayman Islands Monetary authority to express her concerns over the management of the Funds. *Id.* at 7. Midanek, acting as sole independent director of each of the Funds, also adopted written resolutions removing Fletcher as Director of the Funds, and caused the Funds to file winding-up petitions in Cayman Court. Answer ¶ 19-20.

Fletcher asserts that Midanek did not have the authority to remove him and others as directors, and that she paid herself and others with assets from the Funds for activities that were adverse to the Funds. *Id.* at 22. This includes her role in filing the winding up petitions with the Cayman Courts, which ultimately led to the Funds' U.S. bankruptcy. *Id.*

This adversary proceeding is an inappropriate means to address Fletcher's requested relief. Fundamentally, this counterclaim does not raise any claims against the Trustee. *See* Fed. R. Civ. P. 12(b)(6); *Mercator,* 159 F. Supp. 3d at 471. Midanek was not named as a defendant in Fletcher's counterclaims, and she received no notice regarding Fletcher's purported claims relating to her. *See Riverside Capital Advisors, Inc. v. First Secured Capital Corp.,* 28 A.D.3d 457, 460, 814 N.Y.S.2d 646, 649 (2nd Dep't 2006) ("The nonparty entities demonstrated that they were not named as defendants in this action, had not been served with process notifying them of claims against them, and had not been afforded the opportunity to institute a defense. A court has no power to grant relief against an entity not named as a party and not properly summoned before the court."). Accordingly, Counterclaim Five should be dismissed.

46

<u>Counterclaim No. 6</u>    Seeking payment of Fletcher's administrative claim for post-petition services in the Main Case

As discussed above, Fletcher filed a proof of claim [Main Case, Claim No. 8-1] in the amount of $10,070.65 in the main case, seeking from the Debtor unpaid Director's Fees as post-petition Administrative Expenses.  Prior to filing the proof of claim, Fletcher, along with other Insiders, had moved for an order allowing the payment of his and various other director and officer fees as administrative expense claims [Main Case, ECF No. 192].  This Court denied the request without prejudice at a hearing dated March 19, 2014 [Main Case, ECF No. 242 at 31:7-12].  In his Answer, Fletcher submits that "the Court's actions were punitive by refusing to pay for four months of administrative fees."   The Court should not entertain these assertions, which are nothing more than an untimely attempt to reargue prior rulings by the Court.  *See McGee,* 940 F. Supp. 2d at 100 ("Without good reason a court will generally adhere to its own earlier decision on a given issue in the same litigation.") (quotations and citations omitted). As such, Counterclaim Six should be dismissed.

In addition to the foregoing, the Fletcher's Counterclaims should also be dismissed for failure to prosecute.  *See* Fed. R. Civ. P. 41(b) ("If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it.").  A Court has the authority to dismiss *sua sponte* for lack of prosecution as part of its "inherent power" to manage their own affairs and control the docket.  *See Link v. Wabash R. Co*., 370 U.S. 626, 630, 82 S. Ct. 1386, 1389, 8 L. Ed. 2d 734 (1962); *see also* 11 U.S.C. § 105; *U.S. ex rel. Drake v. Norden Sys., Inc*., 375 F.3d 248, 250–51 (2d Cir. 2004) ("[I]nvoluntary dismissal is an important tool for preventing undue delays and avoiding docket congestion."); *In re Kanaley*, 241 B.R. 795, 800 (Bankr. S.D.N.Y. 1999).

Since filing his answer on December 15, 2015, nearly three years ago, Fletcher has not engaged with this case in any meaningful respect. He has not sought discovery on his claims, has not moved to dismiss the claims against him as other co-defendants have, and, as discussed above, did not file any opposition to the Trustee's Motion for Summary Judgment or the supporting Statement of Undisputed Facts. Moreover, as discussed above, it is clear that his counterclaims lack any merit. While dismissal with prejudice is "the harshest of sanctions" and *pro se* complaints should only be dismissed for failure to prosecute "when the circumstances are sufficiently extreme," *Baptiste v. Sommers,* 768 F.3d 212, 216 (2d Cir. 2014), the procedural history here is sufficiently clear to support a finding that Fletcher has failed to pursue his counterclaims. *See, e.g., Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 666 (2d Cir. 1980) (dismissal proper when plaintiff failed to take any action to move his case to trial during six month period); *Ambrose v. Mestre,* 2014 WL 2708021, at *3 (S.D.N.Y. June 16, 2014) ("Since the filing of his complaint [two years prior], Ambrose has failed to interact even once with the Court or with opposing counsel."); *Malone v. HSBC Mortg. Corp. USA*, 2012 WL 406903, *3 (S.D.N.Y. 2012) (ten months); *Isiofia v. District Director of Citizenship and Immigration Service*, 2008 WL 2986273 (S.D.N.Y. 2008) (*pro se* plaintiff held to have abandoned claim after eighteen months of inactivity following filing of complaint); *Ahmed v. I.N.S.,* 911 F. Supp. 132, 134 (S.D.N.Y. 1996) (thirty-five months of inactivity).

Fletcher has done nothing to pursue his counterclaims in nearly three years since filing his Answer on December 15, 2015. Whereas Fletcher has clearly withdrawn himself from the litigation proceedings, the Trustee is not required to prove prejudice. *See Wubayeh v. City of New York,* 320 F. App'x 60, 62 (2d Cir. 2009) ("Prejudice resulting from unreasonable delay can be presumed as a matter of law.") (quotations and citations omitted); s*ee also Rudder v. Jimenez,*

2014 WL 1349047, *5 (S.D.N.Y. 2014) ("Courts have held that a continued delay in litigation caused by a dilatory plaintiff is in itself prejudicial to defendants."). While Fletcher has not received express notice that his failure to comply would result in dismissal, he has effectively disassociated himself from the proceedings; notably, he failed to respond to the Trustee's Summary Judgment Motion, which has resulted in significant judgment against him. There is simply no indication that Fletcher intends to pursue his counterclaims, and any further delay would be without purpose. His counterclaims should be dismissed with prejudice, both for failure to prosecute and on the grounds that they are without merit.

## CONCLUSION

In light of the foregoing, the Motion for Summary Judgment should be granted, and Defendant Fletcher's counterclaims should be dismissed with prejudice. The Trustee is entitled to recover damages in the amount of $78 million, plus pre-judgment interest and $350 in filing fee costs. As discussed above, this Court does not have authority to enter a final order or judgment in this case absent the consent of both parties, which has not been given. Therefore, this Decision shall be treated as proposed findings of fact and conclusions of law, subject to the objection procedure set forth in Federal Rules of Bankruptcy Procedure Rule 9033, and a final judgment must be entered by the District Court.

Dated: New York, New York
      November 6, 2018               *s/ Mary Kay Vyskocil*
                                    Honorable Mary Kay Vyskocil
                                    United States Bankruptcy Judge